IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | | |
|---|---|---|
| CYNTHIA ALICE BARTOE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:13-06677 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Order entered April 12, 2013 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 13 and 20.)

The Plaintiff, Cynthia Alice Bartoe (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on March 29, 2010 (protective filing date), alleging disability as of July 15, 2006, due to bipolar disorder, anxiety, asthma, narrowed throat, and emphezema.[1] (Tr. at 14, 172-78, 179-82, 275, 280.)  The claims were denied initially and upon reconsideration. (Tr. at 67-70, 86-88, 91-

---

[1] Claimant filed prior applications for DIB and SSI on June 24, 2004, and June 22, 2009, alleging disability on May 11, 2004, and July 15, 2006, respectively. (Tr. at 165-68, 169-71, 195-96.) Her 2004 claim was denied at the initial level at the administrative process and Claimant did not file any appeal. (Tr. at 195-96.) Her 2009 claim was denied at the reconsideration level in January, 2010, and she did not request an administrative hearing. (Tr. at 63-66, 71-73, 77-79, 80-82, 83-85, 195-96, 276.)

93, 99-101, 102-04.) On December 7, 2010, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 105-06.) A hearing was held on October 4, 2011, before the Honorable Susan L. Torres. (Tr. at 34-62.)  By decision dated October 21, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-26.) The ALJ's decision became the final decision of the Commissioner on January 19, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on April 1, 2013, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2011). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall

v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2011). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we

3

consider when we rate the degree of your functional limitation.

      (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

      (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§

---

    [2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, July 15, 2006. (Tr. at 16, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "chronic obstructive pulmonary disease (COPD)/asthma, headaches, bipolar disorder and panic attacks," which were severe impairments. (Tr. at 16, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light level work as follows:

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [she] must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation and hazards such as machinery and heights. She is limited to routine, repetitive tasks with no production rate or pace work, and can have no interaction with the public and occasional interaction with co-workers and supervisors. She is limited to low stress jobs that require only occasional changes in the work setting and occasional decision making.

5

(Tr. at 18-19, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 25, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a newspaper delivery person/motorized route, outside delivery person, and coin collection, at the unskilled, light level of exertion. (Tr. at 25-26, Finding No. 10.) On this basis, benefits were denied. (Tr. at 26, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on July 24, 1973, and was 38 years old at the time of the administrative hearing, October 4, 2011. (Tr. at 25,.39, 172, 179.) The ALJ found that Claimant had a ninth grade,

6

or limited education and was able to communicate in English. (Tr. at 25, 39, 279, 281.) In the past, she worked as a janitor. (Tr. at 25, 39, 280-82, 289.)

 The Medical Record

The Court has considered all evidence of record, including the medical evidence and summarizes it herein in relation to Claimant's arguments. Claimant's argument focuses on her mental impairments, and therefore, the undersigned has limited the summary of the evidence essentially to the evidence pertaining to Claimant's mental impairments.

*Emergency Room Notes*:

On January 28, 2004, Claimant presented to the emergency room at Charleston Area Medical Center via ambulance for an overdose of Seroquel and Vistaril. (Tr. at 683-85.) Claimant reported that she had been under a great deal of stress and that she took 29 Seroquel 100mg and 12 to 15 Vistaril 25mg pills. (Tr. at 683.) She stated that she was tired and simply wanted to sleep. (Id.) She denied that she was attempting suicide. (Id.) On mental status exam, Claimant was alert and oriented, though her speech was slow and slightly slurred. (Id.) She was slightly lethargic but was aroused easily. (Id.) She was able to follow commands well and answered questions appropriately. (Id.) Given the number of pills that she took, a mental hygiene was taken on her. (Tr. at 684.) Claimant tested positive for marijuana. (Tr. at 685.)

On March 8, 2005, Claimant presented to the emergency room at St. Francis Hospital with complaints of suicidal thoughts. (Tr. at 437-39.) She reported that she attempted to overdose the night before and cut her wrists that morning. (Tr. at 437.) She denied any homicidal ideation. (Id.) At that time, Claimant was taking Lexapro 30mg, Lamictal 100mg in the morning and 200mg in the evening, and Ambien. (Id.) The hospital notes indicated that the cuts to her wrist were superficial and that Claimant walked away from the hospital before being discharged. (Tr. at 440.) Her drug

screen was positive for THC, amphetamines, and opiates. (Tr. at 441.)

*Process Strategies*:

Claimant was seen at Process Strategies from June 17, 2004, through July 21, 2005, by Leon P. Miller II, Ph.D., LSW, and Michelle Thomas, LCSW. (Tr. at 750-762.) On July 19, 2004, Claimant reported that she was approved for a medical card. (Tr. at 761.) Dr. Miller assessed a GAF of 53.[3] (Id.) On August 2, 2004, Ms. Thomas conducted an intake update at which time Claimant reported some paranoia symptoms, improved depression, a two-month history of panic attacks without agoraphobia, lack of energy, irritability, improved concentration and memory, and a decrease in anxiety. (Tr. at 757-58.) Claimant reported that she had met a wonderful man and that her life had improved. (Tr. at 758.) She reported two suicide attempts when in her teens, a history of sexual abuse from the age of five to seven, and a history of being raped twice, once at knife point. (Tr. at 758, 760.) Ms. Miller assessed a GAF of 57. (Tr. at 761.)

On October 12, 2004, Claimant reported that she was staying with her fiancé and on November 2, 2004, Ms. Thomas noted that her mood was good and that she had no anxiety. (Tr. at 754.) She assessed a GAF of 60. (Id.) On December 13, 2004, Claimant reported "up and down" moods, some anxiety and paranoia, and feelings that no one cared. (Tr. at 753.) On January 24, 2005, Claimant reported that her sleep was improved with Ambien. (Tr. at 750.) Claimant did not return to the clinic until July 21, 2005, at which time she reported that she had stopped taking her medications, was over-sensitive, depressed, and suicidal. (Tr. at 751.) On that day however, she reported decreased depression and decreased stress, having resumed her medications. (Id.) She

---

[3]     The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

reported that she had split from her boyfriend and was happy with her new independence. (Id.) Ms. Thomas assessed a GAF of 62.[4] (Id.)

*Prestera Center*:

Claimant resumed mental health treatment on July 20, 2009, when William R. Hall. P.A., a physician's assistant, performed an initial evaluation of Claimant. (Tr. at 601-13.) Claimant, who indicated that she had a disability claim in progress, reported a two-year recurrence of mental symptoms, that had worsened over time. (Tr. at 601.) Claimant reported decreased energy and motivation, decreased appetite, depressed mood, irritability, crying spells, daily suicidal thoughts, poor concentration, forgetfulness, anxiety with agoraphobic features, and random panic episodes. (Tr. at 601-04.) Claimant told P.A. Hall that she smoked marijuana three to four times a day because it helped with her sleep and appetite. (Tr. at 607.) P.A. Hall noted that Claimant maintained good eye contact, maintained normal psychomotor behavior, was anxious and depressed, had a restricted and serious mood and affect, had relevant content of thought, and had spontaneous speech that was coherent and goal-directed. (Tr. at 611.) P.A. Hall diagnosed Bipolar II Disorder, Panic Disorder, and assessed a GAF of 50.[5] (Tr. at 613.) He prescribed Lamictal 25mg, Seroquel XR 300mg, and Klonopin .5mg. (Id.)

From August 10, 2009, through July 12, 2010, Claimant continued to treat with P.A. Hall

---

[4] A GAF of 61-70 indicates that the person has some mild symptoms or "some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

[5] A GAF of 41-50 indicates that the person has some serious symptoms "(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994)

and/or Jeff Priddy, M.D., a psychiatrist, on ten separate occasions. (Tr. at 614-36.) On August 10, 2009, Claimant reported improved sleep, a decreased frequency of panic attacks, and a better relationship with her boyfriend. (Tr. at 614.) Claimant reported on November 23, 2009, that she was having infrequent panic attacks, especially in public. (Tr. at 616.) On December 21, 2009, Claimant reported that she was sleeping well and had no full panic episodes. (Tr. at 618.) She noted that she had gone Christmas shopping that day and also denied any significant relationship problems. (Id.) On January 25, 2010, however, Claimant reported having been denied disability benefits and had a downcast mood. (Tr. at 620.) She also reported restless sleep with frequent nightmares and mild anxiety. (Id.) Her medications were adjusted. (Tr. at 621.) Nevertheless, as usual, Claimant maintained direct eye contact, had an appropriate affect and mildly depressed mood, had a good appetite and fair energy, was not suicidal or homicidal, had normal stream of thought and appropriate content of thought and had baseline cognitive functioning. (Id.)

On April 12, 2010, P.A. Hall and Dr. Priddy noted that Claimant was sleeping relatively well and had no panic episodes. (Tr. at 626.) Her mental status exam essentially was normal. (Tr. at 627.) They opined that her recent memory was normal; her immediate memory, concentration, persistence, and pace were only mildly deficient; and her social functioning was moderately deficient. (Tr. at 629.) They again diagnosed Bipolar II Disorder and Panic Disorder with agoraphobia and assessed a GAF of 55. (Tr. at 630.)

On May 31, 2010, they noted that she was sleeping well and that her anxiety level was within normal limits. (Tr. at 631.) On July 12, 2010, Claimant reported restless, non-restorative sleep with medication, which was discontinued. (Tr. at 635-36, 814-15.) She continued to report an absence of panic episodes and denied any significant relationship problems. (Tr. at 635, 814.)

*Process Strategies*:

Claimant returned to Process Strategies on August 30, 2010, after P.A. Hall left Prestera Center and joined Process Strategies. On August 30, 2010, Dr. Marilou Patalinjug Tyner, M.D., a psychiatrist, and P.A. Hall conducted a comprehensive psychiatric evaluation. (Tr. at 737-39.) Claimant reported a history of extreme instability of mood with recurring episodes of major depression and brief episodes of hypomania, random panic symptoms that worsened in crowds or public places, and avoidant behavior. (Tr. at 737.) Mental status exam revealed consistent eye contact, pleasant and cooperative demeanor, that Claimant managed the behavior of her two-year old granddaughter well, a broad and congruent affect and euthymic mood, normal and spontaneous speech, organized and goal-directed stream of thought, normal content of thought, normal cognition and memory, and good insight and judgment. (Tr. at 738.) Dr. Tyner and P.A. Hall diagnosed Bipolar II Disorder, Panic Disorder with Agoraphobia, and assessed a GAF of 65. (Tr. at 738-39.)

Dr. Tyner and P.A. Hall continued to see Claimant on October 25, 2010, November 22, 2010, and December 20, 2010, for pharmacological management. (Tr. at 726-31.) They noted that Claimant was sleeping well, but was forgetful in her activities of daily living. (Id.) Mental status exams generally revealed a passive demeanor, direct eye contact, an appropriate affect and euthymic mood, adequate sleep, baseline appetite, fair energy, denied suicidal or homicidal ideations, normal and appropriate stream and content of thought, baseline cognitive functioning, and financial stressors. (Id.)

On January 3, 2011, Claimant was examined by Paul Puglisi, M.A., a supervised psychologist, for complaints of memory problems, anxiety, panic attacks, nightmares regarding prior abusive relationships, and depression. (Tr. at 732-36.) On mental status exam, Mr. Puglisi noted that Claimant was oriented , well-groomed, guarded and hyperactive, had a congruent affect and anxious

mood, normal speech, circumstantial thought process, an absence of hallucinations and delusions, and a denial of suicidal or homicidal ideations. (Tr. at 734.) Mr. Puglisi noted that Claimant exhibited symptoms of major depressive disorder by history of manic episodes in the past. (Tr. at 735.) He noted that she had a history of abusive relationships, low self esteem, and submissive behavior. (Id.) Mr. Puglisi diagnosed Bipolar I Disorder most recent episode depressed and panic Disorder. (Id.) He assessed a GAF of 50. (Id.)

On January 10, 2011, Mr. Puglisi and his supervisor, John Todd, Ph.D., a psychologist, conducted a psychological evaluation with a series of tests. (Tr. at 740-49.) Claimant reported difficulty breathing, accelerated heart rate, sweaty palms, shaking and trembling when in crowded places, an aversion to going out in public due to multiple concerns, difficulty initiating conversation with others, submissiveness in romantic endeavors, a history of depression since 15 years old, a history of one or two manic episodes per year for the last five years, low self esteem, a history of suicide attempts with the last one having occurred six or seven years prior, and memory problems. (Tr. at 741.) On mental status exam, it was noted that Claimant established rapport, maintained relevant speech, was oriented, had a congruent affect and an anxious mood, denied suicidal or homicidal ideations, had logical and coherent stream of thought, reported vague details of hearing sounds, had mildly deficient immediate and recent memory, had moderately impaired immediate memory and normal remote memory, had moderately deficient attention and concentration, had mildly deficient insight, and had normal psychomotor activity. (Tr. at 743-44.)

The WAIS-IV revealed a Full Scale IQ of 84, which placed her in the low average range of intellectual functioning. (Tr. at 744-45.) It was noted that her score was consistent with her academic attainment of a tenth grade education and difficulty passing the GED. (Tr. at 745.) Scores on the BDI-II and the BAI-II indicated that Claimant had severe symptoms of depression and anxiety. (Tr.

at 746.) The scores on the WMS-III did not suggest any deficits in immediate or delayed memory. (Tr. at 746-47.) She was diagnosed with Bipolar NOS, Panic Disorder with Agoraphobia, Social Phobia, Posttraumatic Stress Disorder Rule Out, Nicotine Dependence, Avoidant Personality Disorder, and was assessed with a GAF of 41. (Id.)

Dr. Tyner and P.A. Hall continued to see Claimant for medication management from January 17, 2011, through August 29, 2011. (Tr. at 718-725, 816-17, 825-32.) On January 17, 2011, Claimant reported adequate sleep, occasional downcast mood, and continued forgetfulness in activities of daily living. (Tr. at 724.) On April 11, 2011, Claimant reported a general euthymic mood and anxiety levels within normal limits. (Tr. at 718.) On May 9, 2011, Claimant reported adequate sleep, an essentially euthymic mood, and no panic episodes or agoraphobic behavior. (Tr. at 816-17, 829-30.)  On June 27, 2011, Claimant declined a recommendation of individual therapy. (Tr. at 828.) On August 1, 2011, and August 29, 2011, she again denied a recommendation of individual therapy. (Tr. at 825, 832.) On August 29, 2011, Claimant reported adequate sleep, downcast moods at times on a situational basis, and mild general anxiety. (Tr. at 831.) Her mental status exam continued to be essentially normal and it was noted that she was only mildly anxious. (Tr. at 832.)

*Opinion Evidence*:

John Todd, Ph.D., completed a form Psychiatric Review Technique on September 12, 2009, on which he opined that Claimant's Bipolar II Disorder and Panic Attacks were non-severe impairments. (Tr. at 541-55.) He further opined that her impairments resulted in no restrictions of activities of daily living or difficulties in maintaining concentration, persistence, or pace; mild difficulties in maintaining social functioning; and no episodes of decompensation each of extended duration. (Tr. at 551.) Dr. Todd noted that Claimant used cannabis which would continue to

13

exacerbate her mental health issues. (Tr. at 553.) He further noted a wide range of daily activities which were inconsistent severe mental health issues. (Id.)

On December 5, 2009, Holly Cloonan, Ph.D., completed a form Psychiatric Review Technique, on which she opined that Claimant's Bipolar II Disorder and Panic Attacks resulted in mild restrictions of activities of daily living and difficulties in maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and no episodes of decompensation each of extended duration. (Tr. at 558-72.) Dr. Cloonan also noted that Claimant's use of marijuana could exacerbate her anxiety symptoms on a variable basis. (Tr. at 570.) Dr. Cloonan also completed a form Mental RFC Assessment on which she opined that Claimant was moderately limited in only two functional areas: the ability to interact appropriately with the general public and the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. at 573-76.) She opined that Claimant was not limited significantly in all other functional areas. (Id.) Dr. Cloonan opined that Claimant was "able to learn and perform work-like activities with limited contact with others." (Tr. at 575.)

Dr. Todd completed a further form Psychiatric Review Technique on June 22, 2010, on which he opined that Claimant's Bipolar II Disorder and Panic Disorder were non-severe impairments that resulted in no restrictions of activities of daily living, difficulties in maintaining social functioning, or episodes of decompensation each of extended duration; and only mild difficulties in maintaining concentration, persistence, or pace. (Tr. at 587-609.) He noted that Claimant's main complaint is physical in nature. (Tr. at 599.) He further noted that she was capable of performing her self care, preparing simple meals, cleaning, doing laundry, driving and riding in a car, shopping, managing the finances, reading, sewing, using a computer, and interacting with family and a friend. (Id.) Dr. James Binder, M.D., affirmed Dr. Todd's opinion as written on October

14

8, 2010. (Tr. at 689.)

On February 4, 2011, Dr. Marilou Tyner, M.D., completed a form Medical Assessment of Ability to Do Work-Related Activities (Mental), on which she opined that Claimant had poor ability to perform six of the fifteen work-related mental activities including the ability to deal with the public, deal with work stresses, function independently, maintain attention and concentration, behave in an emotionally stable manner, and understand, remember, and carry out complex job instructions. (Tr. at 693-95.) She opined that she had fair ability to perform six activities: relate to co-workers, use judgment, interact with supervisors, relate predictably in social situations, demonstrate reliability, and understand, remember, and carry out complex job instructions. (Id.) Finally, Dr. Tyner opined that Claimant had good ability to perform three activities: follow work rules, maintain personal appearance, and understand, remember, and carry out simple job instructions. (Id.) In support of her opinions, Dr. Tyner noted that Claimant possessed a low average intellectual level, experienced extreme instability of mood, had random panic attacks, and was avoidant and withdrawn socially. (Tr. at 694.)

Dr. Tyner completed a further Medical Assessment of Ability to Do Work-Related Activities (Mental) on August 1, 2011, on which she opined that Claimant had poor ability in four of the 15 work-related mental activities: deal with work stresses, function independently, behave in an emotionally stable manner, and understand, remember, and carry out complex job instructions. (Tr. at 818-20.) She opined that Claimant had fair ability in seven activities: follow work rules, relate to co-workers, use judgment, maintain attention and concentration, relate predictably in social situations, demonstrate reliability, and understand, remember, and carry out complex job instructions. (Id.) She further opined that Claimant had good ability to understand, remember, and carry out simple job instructions. (Tr. at 819.) Dr. Tyner failed to assess two activities: deal with the

15

public and interact with supervisors. (Tr. at 818.) She again noted that Claimant was of a low average intellectual level, had high generalized anxiety, had recurring depression and unstable moods, and lacked confidence and assertiveness. (Tr. at 819.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that she meets Listing of Impairments § 12.04 and in failing to accord greater weight to the opinion of her treating psychiatrist, Dr. Tyner. (Document No. 13 at 8-14.) Claimant contends that she suffers from five of the criteria set forth in the "A" criteria of §12.04, and that Dr. Tyner's opinion fulfill's the "B" criteria and establishes that she has marked restrictions of activities of daily living and marked difficulties in maintaining social functioning. (Id. at 13-14.) She asserts, however, that the ALJ ignored Dr. Tyner's opinion, declined to acknowledge her GAF score, and failed to call a psychological expert to testify regarding any inconsistencies perceived by the ALJ. (Id. at 10-11.) Claimant asserts that contrary to the ALJ's decision, the longitudinal record supports Dr. Tyner's opinions and GAF scores and that the ALJ's decision is not supported by the substantial evidence of record. (Id. at 10-14.)

In response, the Commissioner asserts that the ALJ appropriately considered Dr. Tyner's two opinions and set forth valid reasons for not according them controlling weight. (Document No. 20 at 14-16.) Specifically, the Commissioner contends that the ALJ properly found that Dr. Tyner's opinions were inconsistent with Dr. Tyner's and P.A. Hall's mental status examinations; Dr. Tyner's benign psychiatric evaluation on August 30, 2010; the mental status examinations by Dr. Priddy and P.A. Hall; the findings of Dr. Priddy and P.A. Hall on April 12, 2010; the fact that Claimant did not receive treatment between July 21, 2005, and July 21, 2009; and with Claimant's many self-reported

16

activities and abilities. (Id. at 15.) The Commissioner also contends that the evidence of record was sufficient, and therefore, there was no need for the ALJ to call an expert. (Id. at n.14.)

The Commissioner further asserts that Claimant's mental impairments did not satisfy the requirements of Listing of Impairments § 12.04. (Document No. 20 at 16-19.) The Commissioner addresses the "B" criteria and asserts that based upon Claimant's many reported activities, the ALJ properly and reasonably determined that she had only mild restrictions in activities of daily living and moderate difficulties in social functioning. (Id. at 18.) Regarding concentration, persistence, and pace, the Commissioner notes that Claimant acknowledged she drove, did puzzles, read, played computer and video games, managed money, and watched television. (Id. at 19.) Furthermore, the Commissioner notes that Dr. Priddy and P.A. Hall determined that Claimant was mildly deficient in this area. (Id.) Thus, the ALJ properly found that she had only moderate difficulties in maintaining concentration, persistence, or pace. (Id.) Finally, the Commissioner notes that the evidence did not establish any repeated episodes of decompensation of an extended duration. (Id.) Accordingly, because Claimant failed to satisfy the "B" criteria of Listing §12.04, she did not satisfy Listing §12.04. (Id. at 19-20.)

Analysis.

Claimant alleges that the ALJ erred in failing to give controlling weight to her treating psychiatrist's opinion. (Document No. 10 at 3-6.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2011). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the

17

weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2011). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924

F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In the instant matter, the ALJ gave little weight to the findings and opinions of Dr. Tyner because her findings were not supported by the mental status examinations or the medical evidence of record. (Tr. at 24.) The ALJ noted that in August, 2010, Dr. Tyner assessed a GAF of 65, which contradicted the severe limitations set forth in her opinions. (Id.) She further noted that Dr. Tyner's opinions were inconsistent with the numerous GAF scores of record which ranged from 41 to 65, from various providers. (Id.) She noted, however, that the GAF scores reflected a given circumstance or time period and did not consistently reflect the longitudinal record. (Id.) Finally, the ALJ noted that Dr. Tyner's opinions included consideration of no work with the public and only occasional work with supervisors. (Id.) The VE testified that with these limitations, Claimant was capable of performing the identified jobs. (Id.)

As the ALJ found, Dr. Tyner's opinions were inconsistent with her treatment notes. Dr. Tyner and P.A. Hall examined Claimant on August 30, 2010, and noted an essentially normal mental

status exam, diagnoses of bipolar II disorder and panic disorder with agoraphobia, and an assessed GAF score of 65, which was indicative of only mild symptoms. (Tr. at 22, 25, 737-39.) Dr. Tyner and P.A. Hall continued to see Claimant from October 25, 2010, through December 20, 2010, and then from January 17, 2011, through August 29, 2011, for medication management. (Tr. at 22, 25, 726-31, 718-25, 816-17, 825-32.) These treatment notes reflect varying reports of downcast moods and some forgetfulness in activities of daily living, but do not reveal any significant deficit on mental status exam. (Id.) In fact, the mental status exams continued to be normal and it was noted on August 29, 2011, that she was only mildly anxious. (Tr. at 22, 25, 832.) Claimant denied recommendations of individual therapy, but she explained at the administrative hearing that she did so because she had no means of transportation. (Tr. at 22, 25, 52, 825, 828, 832.) As the ALJ found, Dr. Tyner's treatment records do not contain any significant adverse findings that would support her severe mental limitations.

Furthermore, as the ALJ found, Dr. Tyner's opinions are inconsistent with the other evidence of record, including the various GAF scores assessed. (Tr. at 25.) Claimant treated with P.A. Hall and Dr. Priddy at the Prestera Center from July 20, 2009, through July 12, 2010. (Tr. at 22, 25, 601-36.) She presented with a history of decreased energy and motivation, depressed mood, irritability, crying spells, daily suicidal thoughts, forgetfulness, anxiety with agoraphobic features, and random panic episodes. (Tr. at 22, 25, 601.) With treatment her conditions improved and as of December 21, 2009, Claimant reported that she was sleeping well, had no full panic episodes, and had gone Christmas shopping. (Tr. at 22, 25, 618.) P.A. Hall and Dr. Priddy assessed only mildly deficient immediate memory, concentration, persistence, and pace, and moderately deficient social functioning on April 12, 2010. (Tr. at 22, 25, 627.) They assessed a GAF of 55, which was indicative of only moderate symptoms. (Id.) Anxiety levels were within normal limits in May, 2010, and

Claimant continued to report an absence of panic episodes in July, 2010. (Tr. at 22, 25, 635, 814.)

On January 3, 2011, Paul Puglisi assessed a GAF of 50 (Tr. at 22, 25, 735.), but on January 10, 2011, and inconsistent with then current records, Mr. Puglisi and Dr. Todd assessed a GAF of 41, which indicated serious symptoms. (Tr. at 22, 25, 747.) Their testing indicated severe symptoms of depression and anxiety, and intellectual functioning in the low average range. (Tr. at 22, 25, 745.) Testing however, did not demonstrate any deficits in immediate or delayed memory despite Claimant's forgetfulness. (Tr. at 22, 25, 746-47.)  Nevertheless, consistent with the ALJ's findings, they assessed only moderate deficiencies in attention and concentration. (Tr. at 22, 25, 743-44.)

Claimant testified that due to panic and anxiety attacks, she was unable to shop alone and shopped only with her parents. (Tr. at 19, 44.) She reported that she did not like to socialize and spent all her time with her parents and her boyfriend. (Tr. at 19, 43.) When at home, she testified that she watched television all day or sat on the porch to smoke her cigarettes. (Tr. at 19-20, 44, 53.) She indicated that she left her parents' home twice a week to travel to the store with them or to the park to sit alone at night. (Tr. at 20, 45.) She performs her personal care but her parents perform all household chores and cooking. (Tr. at 20, 49.) Notwithstanding her testimony, the ALJ noted that Claimant reported on her function reports that she was able to cook, clean, vacuum, prepare meals, maintain her hygiene, shop, attend medical appointments, watch television, read, play video games, use the computer, manage a checkbook, pay bills, maintain a multi-year relationship with her boyfriend, and assist in watching children. (Tr. at 23, 236-43, 266-73, 314-21.)

In view of the foregoing, the undersigned finds that the ALJ's decision to accord little weight to Dr. Tyner's opinions is supported by substantial evidence. Dr. Tyner's opinions were inconsistent with the substantial evidence of record. The undersigned further finds that pursuant to 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii) (2011), the evidence before the ALJ was sufficient for her to

21

issue an informed decision and therefore, she was not required to seek the testimony of a medical expert. The decision to call a medical expert is left to the discretion of the ALJ. See Siedlecki v. Apfel, 46 F.Supp.2d 729, 732 (N.D. Ohio 1999). Accordingly, the undersigned finds that the ALJ's decision in this regard is supported by substantial evidence.

## 2. Listing of Impairments 12.04.

Claimant also alleges that she meets the criteria for Listing of Impairments § 12.04. (Document No. 13 at 8-14.) "The Listing of Impairments . . . describes, for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. §§ 404.1525(a), 416.925(a) (2011); see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990). "For a claimant to qualify for benefits by showing that h[er] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." See id. at 531 (emphasis in original).

Section 12.04 of the Listing of Impairments covers Affective Disorders, and provides as follows:

> *Affective Disorders.* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
> A.  Medically documented persistence, either continuous or intermittent, of one of the following:
> 1.  Depressive syndrome characterized by at least four of the following:
> a.  Anhedonia or pervasive loss of interest in almost all activities; or
> b.  Appetite disturbance with change in weight; or
> c.  Sleep disturbance; or
> d.  Psychomotor agitation or retardation; or
> e.  Decreased energy; or
> f.  Feelings of guilt or worthlessness; or

22

g.  Difficulty concentrating or thinking; or

h.  Thoughts of suicide; or

i.  Hallucinations, delusions, or paranoid thinking;

or

2.  Manic syndrome characterized by at least three of the following:

a.  Hyperactivity; or

b.  Pressure of speech; or

c.  Flight of ideas; or

d.  Inflated self-esteem; or

e.  Decreased need for sleep; or

f.  Easy distractability; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h.  Hallucinations, delusions or paranoid thinking;

or

3.  Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.  Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning: or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 12.04 (2011).

Respecting the "B" criteria, the ALJ concluded that Claimant had a mild restriction in activities of daily living. (Tr. at 17-18.) The ALJ noted Claimant's testimony that she watched television, went to the store with her parents, and went to the park alone. (Tr. at 17, 44-45, 53.)

Nevertheless, the ALJ also acknowledged Claimant's function reports which indicated that she cared for her pets, did dishes and laundry, vacuumed, read, sewed, watched movies, worked puzzles, played on the computer, and played video and cell phone games. (Tr. at 17-18, 236-43, 266-73, 314-21.) The undersigned therefore finds that the ALJ's decision is supported by the substantial evidence of record.

The ALJ further found that Claimant had moderate difficulties in maintaining social functioning. (Tr. at 18.) She again noted Claimant's testimony that she was afraid to go out alone but was able to go to the store with her parents. (Tr. at 18, 44.) However, the function reports indicated that Claimant maintained a relationship with her boyfriend and his two children, used to attend social events but then stayed only with her boyfriend, and was able to shop for groceries and household items if accompanied by someone. (Tr. at 18, 236-43, 266-73, 314-21.) The undersigned finds that the ALJ's finding is consistent with the treatment notes and is supported by the substantial evidence of record.

The ALJ also found that Claimant had moderate difficulties in maintaining concentration, persistence, or pace. (Tr. at 18.) She noted, however, that despite alleged difficulties in concentration, Claimant was able to read, watch television and movies, play video and cell phone games, use the computer, and work puzzles. (Tr. at 18, 236-43, 266-73, 314-21.) Additionally, function reports indicated as stated above, that Claimant was able to count change, pay bills, handle a savings account and manage a checkbook, and did not require reminders for medication or appointments. (Id.) Additionally, the undersigned notes that psychological testing failed to suggest any significant deficits in immediate or delayed memory. (Tr. at 746-47.) Accordingly, the undersigned finds that substantial evidence supports the ALJ's decision.

Finally, the ALJ determined that Claimant had not experienced any episodes of decompensation, which were of extended duration. (Tr. at 18.) The undersigned finds that the evidence did not suggest any such episodes and that the ALJ's decision is supported by the substantial evidence of record.

In view of the foregoing, the ALJ failed to find that Claimant had any marked limitations under the "B" criteria of § 12.04. Criteria ""A" and B" of Listing § 12.04 are in the conjunctive, and because Claimant failed to satisfy the criteria of section "B," she therefore fails to meet the Listing in its entirety. Accordingly, the undersigned finds that the ALJ's decision that Claimant failed to meet Listing § 12.04 is supported by the substantial evidence of record.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 13.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 20.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 19, 2014.

R. Clarke VanDervort
United States Magistrate Judge